UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIANI DODSON AND LOIS DODSON,

Plaintiffs,

v.

KARLA NAVA LOPEZ, DION EMANUEL,
PETER YI, ERNEST WILSON, S.K. KUE,
B.I. FERRERIRA, F. TOTI, S.W.
CHOUCAIR, and the CITY OF DETROIT.,

Defendants.

_____/

Case No. 20-cv-12056

U.S. District Court Judge
Gershwin A. Drain

**OPINION AND ORDER DENYING DEFENDANT CITY OF DETROIT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 26),
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT (ECF No. 27), AND SETTING NEW DATES**

## I. INTRODUCTION

On July 30, 2020, Plaintiffs Tiani Dodson and Lois Dodson initiated this civil rights action against Defendants Karla Nava Lopez, Dion Emanuel as well as the City of Detroit ("Detroit" or the "City") and Detroit police officers Peter Yi, Ernest Wilson, S.K. Kue, B.I. Ferreira, F. Toti, and S.W. Choucair (collectively the "Detroit Defendants"). *See* ECF No. 1. Plaintiffs' claims arise from an allegedly improper

1

ejectment from their home.  *Id.*   Presently before the Court is Defendant City of Detroit's Motion for Partial Summary Judgment (ECF No. 26).  Plaintiffs timely responded.  ECF No. 28.  Also before the Court is Plaintiffs Motion for Partial Summary Judgment (ECF No. 27).   The Court denied leave for the Detroit Defendants to file a late response.  The Could held a hearing on both matters on November 7, 2022.  For the following reasons the Court **DENIES** Defendant City of Detroit's Motion for Partial Summary Judgment (ECF No. 26) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (ECF No. 27).

## II.   BACKGROUND

### A. Factual Background

#### 1.  The Dodson's Possession of the Residence

On or about July 3, 2017, Plaintiff Tiani Dodson and her daughter, Plaintiff Lois Dodson, took possession of a residential property located at 6416 Barton in Detroit, Michigan (the "Residence").   T. Dodson Depo. 8–9, ECF No. 26-4, PageID.178.  Defendant Nava Lopez owned the Residence, but her adopted father, Orlando Watkins, oversaw the property for her while she was in California.  *Id.* at 910, PageID.178–79.  Immediately prior to moving into the Residence, Ms. Dodson made a verbal agreement with Mr. Watkins, Lois Dodson's basketball coach, that

she could fix up the house in lieu of paying rent.[1]  *Id.*  Pursuant to this agreement, Ms. Dodson painted, installed drywall, repaired the roof, repaired the porch, painted the porch, removed "mounds and mounds of debris," and laid a bathroom floor.  *Id.* at 12, PageID.179.

In January or February of 2019, Ms. Nava Lopez called Ms. Dodson and informed her that she would need to start paying rent in April of that year.  *Id.* at 11, PageID.179.  Ms. Dodson was no longer able to reach Mr. Watkins from that point forward.  *Id.* at 14, PageID.180.  Instead, in March 2019, Ms. Dodson received a letter stating that Defendant Emanuel was the Residence's new property manager and that all rent payments should be made to him.  *Id.* at 13–15, PageID.179–80.  Mr. Emanuel also provided Ms Dodson with a residential lease agreement for a month-to-month term that listed Ms. Nava Lopez as the landlord and Ms. Dodson as the tenant.  *Id.* at 13, PageID.179; ECF No. 27-13, PageID.401.  It's unclear whether Ms. Nava Lopez ever signed the lease agreement as Ms. Dodson does not appear to have received a copy of the executed agreement.  *See* T. Dodson Depo. 12–13, ECF No. 26-4, PageID.179.

Ms. Dodson received a letter in April saying that her landlord could have her evicted if she did not move by June 6, 2019 (the "Notice to Quit").  *Id.* at 16–17,

---

[1] Hereinafter, the Court will refer to Tiani Dodson as "Ms. Dodson" and her daughter by her full name.

3

PageID.180.  Ms. Dodson tried to contact Mr. Emanuel, Mr. Watkins, and Ms. Nava Lopez about the letter but received no response.  *Id.* at 18, PageID.181.  Although she did not begin paying rent at this time, Ms. Dodson continued to pay the utilities. *Id.*  Ms. Dodson did not start paying rent into an escrow account at this time because she did not learn what those were until after her ejectment.  *Id.* at 63, PageID.192.

### 2.  The Ejection

During the morning of November 9, 2019, Lois Dodson called her mother, who was out at the time, to inform her that Ms. Nava Lopez, whose name Lois did not know at the time, was at the Residence saying that she was there to evict the Dodson's.  L. Dodson Depo. 18–19, ECF No. 27-14, PageID.419.  Upon Ms. Dodson's arrival, Ms. Nava Lopez informed her that she had called the police.[2]  T. Dodson Depo. 29, ECF No. 26-4, PageID.183.  Ms. Dodson also called the police and testified that the dispatcher agreed with her that she could not be evicted without having first been to court.  *Id.* at 29–30, PageID.18384.

Defendants Yi and Ferreira were the first to arrive to the scene, with Defendants Toti and Choucair acting as the assisting unit.  Toti Depo. 12, ECF No. 27-9, PageID.322.  Ms. Dodson testified that the officers initially informed Ms. Nava

---

[2] It is unclear from the record whether Ms. Nava Lopez, in fact, called the police as the Defendant Officers only testified about being dispatched to address Ms. Dodson's call.

Lopez that there was nothing they could do.  T. Dodson Depo. 29–30, ECF No. 26-4, PageID.183–84.  The officers called their sergeant, Defendant Kue, for support. Kue Depo. 7, ECF No. 26-5, PageID.209.  Upon his arrival, Sergeant Kue asked Ms. Dodson for any paperwork that she had.  T. Dodson Depo. 30, ECF No. 26-4, PageID.184.  Sergeant Kue recalled that Ms. Nava Lopez had what "appeared to be like a deed and some kind of eviction notice or paperwork," although he could not recall what the paperwork entailed.  Kue Depo. 16, ECF No. 26-5, PageID.211. When discussing the incident later with then Sergeant Wilson, Sergeant Kue explained that he had reviewed the Notice to Quit.  Wilson Depo. 34–36, ECF No. 28-6, PageID.508.

In contrast, Ms. Dodson described her verbal agreement with Mr. Watkins' name, whose name she could not remember, and provided paperwork that was unsigned.  Kue Depo. 16, ECF No. 26-5, PageID.211.  Additionally, the officers noted the Residence had an illegal electrical hookup, which is indicative of someone illegally living at a location, *id.* at 17, PageID.211, although Officer Ferreira recalled Ms. Dodson providing a utilities bill that was only a couple months old, Ferreira Depo. 23, ECF No. 27-8, PageID.305.  None of the officers recalled reviewing an eviction complaint or the 36th District Court docket to determine whether there were ongoing eviction proceedings involving Ms. Dodson and Ms. Nava Lopez, and there were not bailiffs present at the scene.  *See, e.g.*, Kue Depo. 16–17, ECF No. 26-5,

5

PageID.211. Nevertheless, Sergeant Kue told Ms. Dodson that her lease was fraudulent and asked her to stay in the living room while he spoke with Ms. Nava Lopez privately. T. Dodson Depo. 30, ECF No. 26-4, PageID.184. He also spoke with Ms. Dodson privately. Toti Depo. 18, ECF No. 27-9, PageID.324.

Officer Kue unsuccessfully encouraged Ms. Dodson and Ms. Nava Lopez to peacefully resolve the issue amongst themselves. *See, e.g.*, Ferreira Depo. 28, ECF No. 27-8, PageID.306. As such, Because Ms. Dodson could not provide proof of ownership or lawful residence other than her furniture being in the residence, Sergeant Kue advised her to leave the premises to avoid a physical altercation between her and Ms. Nava Lopez. Kue Depo. 18, ECF No. 26-5, PageID.212. Ms. Dodson specifically remembers Sergeant Kue telling her that she had to leave the Residence and Officer Ferreira telling her friend that she would be leaving that day. *Id.* at 31–33, PageID.184. Officer Toti testified that Sergeant Kue "was the only one to make that call." Toti Depo. 18–19, ECF No. 27-9, PageID.324; *see also* Yi Depo. 12, PageID.341. Notably, the Detroit Police Department Incident Report states, "[The] supervisor arrived on scene and after reviewing the eviction paperwork and seeing that it was valid, stated to the complainant, that she had to vacate the premises." ECF No. 26-2, PageID.171.

6

Ms. Nava Lopez had the locks on the Residence changed while Ms. Dodson and Lois Dodson were still present.[3]  T. Dodson Depo. 31, ECF No. 26-4, PageID.184.  Officers Yi, Ferreira, Toti, and Choucair were present while Ms. Dodson removed her possessions from the Residence, although Officers Toti and Choucair left before she finished.  ECF No. 26-2, PageID.171; Toti Depo. 19–20, ECF No. 27-9, PageID.324.  The officers did not allow Ms. Dodson's friend to help her pack her things, nor did they help her themselves, so she was forced to leave everything but two bags of clothing behind.  T. Dodson Depo. 31, 33–36, ECF No. 26-4, PageID.18485.  She attempted to leave other items that she was physically capable of moving by herself on her neighbors' porches to be picked up later, but they were either stolen or damaged by the snow.  *Id.* at 47–48, PageID.188, 6567, PageID.192–93.  Ms. Dodson claims that the people who helped Ms. Nava Lopez change the locks took most of her power tools and gardening equipment from the basement.  *Id.* at 49, PageID.188.  Ms. Dodson also testified that she did not contact anyone about obtaining the rest of her possessions after the ejection because one of the officers told her that she would go to jail if she returned to the property.  *Id.* at 64, PageID.192.

---

[3] Officers Ferreira and Toti testified that Ms. Nava Lopez changed the locks before the officers arrived.  Ferreira Depo. 26, ECF No. 27-8, PageID.306; Toti Depo. 17, ECF No. 27-9, PageID.323.

On November 13, 2019, Ms. Dodson went to the Detroit Police Department to file a citizen complaint about the officers' role in the ejection.  Wilson Depo. 7, ECF No. 28-6, PageID.501.  Defendant Wilson began taking the complaint but was called away, so Sergeant Danielle Murray took over.  *Id.* at 27, PageID.506.  Former Sergeant Wilson instructed her to forward it to the Chief Investigator's Office.  *Id.* He recalled that the Chief Investigator's Office determined the complaint was unfounded.  *Id.* at 8, PageID.501.

### 3.  The Michigan Eviction Process

The state of Michigan provides detailed eviction procedures.  First, if the landlord seeks to evict the tenant for nonpayment of rent, the landlord must first serve the tenant with a seven-day notice to quit.  MCL 554.134(2).  If the eviction is for any other reason, except for limited exceptions which do not apply here, the notice to quit must be served on the tenant thirty days in advance.  MCL 554.134(1). If the tenant fails to pay rent or vacate the premises within that period, the landlord may initiate summary proceedings.  MCL 600.5714(1)(a).  If the court finds in favor of the landlord, it shall issue a writ commanding a court officer, bailiff, sheriff, or law enforcement officer to restore the property to the landlord "by removing all occupants and all personal property from the premises."  MCL 600.5744.

Additionally, the Michigan Anti-Lockout Statute, MCL 600.2918, provides, in relevant part, that:

Any tenant in possession of premises whose possessory interest has been unlawfully interfered with by the owner is entitled to recover the amount of his or her actual damages or $200.00, whichever is greater, for each occurrence and, if possession has been lost, to recover possession. Subject to subsection (3), unlawful interference with a possessory interest includes 1 or more of the following:

> (a) Use of force or threat of force.
> (b) Removal, retention, or destruction of personal property of the possessor.
> (c) Changing, altering, or adding to the locks or other security devices on the property without immediately providing keys or other unlocking devices to the person in possession.

MCL 600.2918(2)(a)–(c).

### 4. Detroit Police Officer Training

Sergeant Kue testified that he was trained on evictions and landlord-tenant disputes "very briefly." Kue Depo. 12, ECF No. 26-5, PageID.210. He thought this training might have occurred while he was in the police academy, but he was not sure. *Id.* He did not recall receiving any training on the issue since leaving the police academy other than learning that evictions and landlord-tenant disputes are civil matters. *Id.* at 13, PageID.210. Nor did Sergeant Kue recall receiving any training on evictions or landlord-tenant disputes after the Dodson's ejection. *Id.* at 14, PageID.211. Sergeant Kue testified that, as with all civil matters, the role of an officer in such situations is "just to keep the peace" and "make sure no one is breaking any law," particularly by becoming violent. *Id.* at 13, PageID.210.

9

Sergeant Kue understood an eviction to require a "legal court order" but had never seen an eviction order and was not sure what an eviction complaint was. *Id.* at 14–16, PageID.211.  He also agreed that, as an officer, he does not have authority to determine who is right in a landlord-tenant dispute. *Id.* at 21, PageID.212.

Officer Ferreira testified that he did not recall getting trained on evictions or landlord-tenant disputes until the COVID-19 Pandemic started in 2020, when officers were increasingly dispatched to address such situations.[4]  Ferreira Depo. 12–13, ECF No. 27-8, PageID.302.  Like Sergeant Kue, he did not recall any in-depth training on the matter during the police academy, *id.* at 14, PageID.303, but was aware that "some paperwork" from a court is needed, *id.* at 18, PageID.304.  He described the topic as "still something that is . . . blurry or murky" and explained that he still calls a supervisor for clarification when responding to such dispatch calls. *Id.*  Calling a supervisor for assistance is part of the regular practice in the

---

[4] Former Sergeant Wilson testified that he coordinated a training on landlord-tenant disputes in 2020.  Wilson Depo. 12–15, ECF No. 28-6, PageID.502–03.  Sergeant Gilbert, who runs the squatter task force, conducted the training.  Ferreira Depo 13, ECF No. 27-8, PageID.302.  During the training, Sergeant Wilson advised attendees to stay "in constant communication with her" when responding to landlord-tenant disputes so she could "guide [them] through it." *Id.* at 16, PageID.303.  Officers have taken her up on that offer, but whether to do so is up to the officer's discretion.  Wilson Depo. 19, ECF No. 28-6, PageID.504.

Sergeant Wilson testified that he also gave an eviction training in 2020. *Id.* at 21, PageID.504.

Detroit Police Department.  *Id.* at 15, PageID.303.  Officer Toti testified that he was explicitly instructed to do so whenever responding to an ejection call.  Toti Depo 11, PageID.322

Similarly, Officers Yi, Toti, and Choucair testified that they did not recall ever being trained on evictions or landlord-tenant disputes.  Yi Depo. 9, ECF No. 27-10, PageID.340; Toti Depo 6–7, ECF No. 27-9, PageID.321; Choucair Depo. 10, ECF No. 27-11, PageID.357.  Indeed, former Sergeant Wilson testified that the Detroit Police Department does not require regular training on evictions.  Wilson Depo. 16–17, ECF No. 28-6, PaegID.503.  Nevertheless, both Officers Yi and Toti learned on the job that an eviction notice must be signed by a judge and that the tenant has thirty days from service of the notice to vacate the premise.  Yi Depo. 9–10, ECF No. 27-10, PageID.340–41; Toti Depo 9–11, ECF No. 27-9, PageID.321–22.  Officer Toti explicitly stated that a "notice to quit is not an eviction notice" and thus insufficient to evict someone.  *Id.* at 24, PageID.325.  And Officer Choucair testified that Detroit Police officers "do not interfere" in civil matters, such as "whenever there's a situation pertaining to eviction."  Choucair Depo. 12, ECF No. 27-11, PageID.357.  Instead, bailiffs conduct the evictions, and police officers "just provide[] visible presence support."  Kue Depo. 29, ECF No. 26-5, PageID.214.

The officers' understandings are consistent with former Sergeant Wilson's and Sergeant Gilbert's trainings on the eviction process.  Wilson Depo. 23–25, ECF

11

No. 28-6, PageID.505.  However, former Sergeant Wilson also testified that officers have authority to determine if someone residing in a building is a squatter and thus subject to removal.  *Id.* at 36–37, 39–40, PageID.508, 509.  Notably, Officer Toti thought this legal proceeding arose from a different ejection until he reviewed the body worn camera footage from the incident.   Toti Depo 28, ECF No. 27-9, PageID.326.

## B. Procedural Background

Plaintiffs brought claims for unlawful seizure and deprivation of liberty and property interests without due process of law in violation of the Fourth and Fourteenth Amendments against the Defendant Officers through 28 USC § 1983 (Count I), unlawful ejection and interference with possessory interest in residence in violation of MCL 600.2918 against Defendants Nava Lopez and Emanuel (Count II), civil conspiracy against each of the named Defendants (Count III), and *Monell* liability against the City of Detroit (Count IV) .  ECF No. 1, PageID.8–14.

Neither Ms. Nava Lopez nor Mr. Emanuel have answered the suit.   As discussed *supra*, both the City and Plaintiffs have moved for summary judgment. For the following reasons, the Court will deny both motions.

12

### III.   LAW & ANALYSIS

**A. Legal Standard**

"Summary judgment is appropriate when there is 'no genuine dispute as to any material fact' and the moving party 'is entitled to judgment as a matter of law." *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if its resolution will affect the outcome of the lawsuit." *Id*.  The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  To support their arguments for or against summary judgment, parties may "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  They may also "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Thus, if the nonmoving party will bear the burden of proof on a

claim, the movant "need only demonstrate that the nonmoving party has failed to 'make a showing sufficient to establish the existence of an essential element' of that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322). Thereafter, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). When parties file cross-motions for summary judgment, the court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Hensley v. Gassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir.1994)).

Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[The] general rule [is] that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (quotation marks omitted)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "When opposing parties tell two different stories,

14

one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B. Discussion

### 1. Defendant City of Detroit's Motion for Partial Summary Judgment

The City moves for summary judgment, arguing that Plaintiffs have failed to state their *Monell* claim because they have "not pointed to a formally adopted policy or a custom that has been formally approved by an appropriate decision maker." ECF No. 26, PageID.165. For the following reasons, the Court disagrees.

Local governments cannot be sued under § 1983 based solely on injuries inflicted by their employees or agents. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Plaintiffs can make this showing in four ways: "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or

acquiescence of federal violations." *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018) (citation omitted).

In their complaint, Plaintiffs contend that "Defendant City of Detroit, through the Detroit Police Department, had a policy, practice, and/or custom of evicting residential tenants without a court order and without assessing whether the eviction was lawful." ECF No. 1, PageID.14. The City seems to argue that it is entitled to summary judgment because Plaintiffs have not satisfied the first method for establishing *Monell* liability. ECF No. 26, PageID.165–66. However, in their Response to the City's Motion, Plaintiffs assert that the City "obviously failed to adequately train its officers regarding their statutory and constitutional duties on the legal eviction process." ECF No. 28, PageID.464. The Court will thus address the merits of Plaintiffs' failure to train claim.[5]

To show that the City is liable under *Monell* based on a failure-to-train claim, Plaintiffs "must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson*, 925 F.3d at 834 (citation omitted). When determining

---

[5] That the Detroit Police Department has a policy directing officers confronted with civil disputes to prevent or quell a breach of the peace, ECF No. 26, PageID.166, is not relevant to this analysis.

whether a municipality has adequately trained its employees, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Here, viewing the evidence in the light most favorable to the nonmoving party, *Anderson*, 477 U.S. at 255, Plaintiffs in this case, there is a material issue of fact whether the City's training program was adequate for officers to respond to landlord-tenant disputes/evictions at the time of the incident giving rise to this case. Indeed, all the Defendant Officers testified that, prior to the Dodson's ejection, either their only training on landlord-tenant disputes/evictions was a brief session during the police academy or they had not been trained on such matters at all. The Defendant Officers include two pairs of partnered officers and two sergeants. The number of officers and inclusion of different levels of seniority are indicative of a general lack of training on this topic. *See e.g.*, *Shadrick v. Hopkins Cnty., Kentucky*, 805 F.3d 724, 740 (6th Cir. 2015) (finding training program inadequate because "[w]hile the nurses may have received some limited on-the-job training when beginning their employment . . . there is no proof of a training program that was designed to guide [] nurses in [certain medical tasks] in order to avoid constitutional violations."); *Woodall v. Wayne Cnty.*, 590 F. Supp. 3d 988, 1010 (E.D. Mich. 2022), *reconsideration denied,* No. 17-13707, 2022 WL 1469210 (E.D. Mich. May 10, 2022) (finding that single officer's lack of training on strip searches was "probative

17

of a general lack of training" because she was one of two officers who performed the searches).

> "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (internal quotation marks omitted). "In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of Cty. Comm'rs*, 520 U.S. at 412, 117 S.Ct. 1382).
>
> A plaintiff may meet this standard by showing either (1) "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it" or (2) "evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012) (citing *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

*Jackson*, 925 F.3d at 836.

Here, there is ample evidence in the record that dispatch calls concerning landlord-tenant disputes are "recurring" and "present[] an obvious potential for" Detroit Police Officers to participate in unlawful ejections. *Jackson*, 925 F.3d at 836 (quoting *Campbell*, 700 F.3d at 794). Indeed, Plaintiffs presented evidence that Detroit Police Officers unlawfully evicted Rosey White in 2016, years before the Dodson's ejection, and Whitney Burney in December 2020, almost a full year after.

18

ECF No. 28-5.  Moreover, Defendant Toti thought this legal proceeding arose from a different ejection until he reviewed the body worn camera footage from the incident.  Toti Depo 28, ECF No. 27-9, PageID.326.  This indicates that he was involved in at least one other ejection that could subject him to liability.

Additionally, Defendant Ferreira testified that there was a training on landlord-tenant disputes and evictions during the COVID-19 Pandemic because officers "began to get more and more of those types of police runs."  Ferreira Depo. 12–13, ECF No. 27-8, PageID.302.  Notably, Sergeant Gilbert, who conducted the training, runs a task force wholly dedicated to dealing with "evictions, squatters, or any landlord-tenant problems."  Wilson Depo. 13, ECF No. 28-6, PageID.502. Given the frequency with which officers respond to landlord-tenant disputes, the Detroit Police Department's failure to train its officers on the lawful eviction process, prior to 2020, presented an obvious potential for unlawful ejections.  *See Connick v. Thompson*, 563 U.S. 51, 64 (2011) ("There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force.  And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require.  Under those circumstances there is an obvious need for some form of training.").

Finally, it is clear from the record that the lack of training on landlord-tenant disputes "was closely related to or actually caused" the Dodson's ejection. *Jackson*,

19

925 F.3d at 834 (citation omitted).  Indeed, "the high degree of predictability [of the injury] may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bd. of Cnty. Comm'rs*, 520 U.S. at 409–10.  Here, several of the Defendant Officers testified that they learned the lawful eviction process after the Dodson's ejection. Regardless of their confusion over the Notice to Quit it is likely that many would have been tipped off to Ms. Nava Lopez's lack of court order due to the absence of bailiffs if they had received training before the incident.

Plaintiffs have established their failure to train claim.  As such, the Court will deny Defendant City of Detroit's Motion for Partial Summary Judgment.

### 2.  Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have also moved for summary judgment, asserting that they have established their Fourth and Fourteenth Amendment and *Monell* claims as matter of law.  For the following reasons, the Court disagrees.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir.2009) (citation omitted).  For the following reasons, the Court finds there is a

material issue of fact whether Plaintiffs have established deprivations of their Fourth and Fourteenth Amendment rights.

### i. Fourth Amendment Claim

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in relevant part that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  This right applies with equal force in both the civil and criminal contexts.  *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 539 (1967).  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  In *Soldal v. Cook County, Illinois*, 506 U.S. 56 (1992), the Supreme Court "recognized that the participation of a police officer in an improper eviction constitutes a seizure in violation of the Fourth Amendment."  *Thomas v. Cohen*, 304 F.3d 563, 570 (6th Cir. 2002); *see also Soldal*, 506 U.S. at 69 ("[T]he right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all.").

Plaintiffs seem to concede that they must have been tenants, and thus had a lawful possessory interest in the Residence, to establish a Fourth Amendment

21

violation.  *See, e.g.*, ECF No. 27, PageID.259. (Because Plaintiffs were tenants of the home, . . . it is clear that their possessory interests in their place of residence were meaningfully interfered with when the officers deprived Plaintiffs of their place of residence in the absence of any court order permitting the eviction, thus effectuating a seizure within the meaning of the Fourth Amendment.").  Indeed, tenancy was not in dispute in *Soldal* and *Thomas*, the cases on which Plaintiffs rely.  *See Soldal*, 506 U.S. at 58, (defendant mobile home park and employees towed rent-paying plaintiffs' mobile home from lot while eviction proceedings were pending with officer acquiescence); *Thomas*, 304 F.3d at 566 ("Defendants have conceded for purposes of this appeal that Plaintiffs were tenants of the Augusta House.").

Here, in contrast, there is a material issue of fact as to whether the Dodson's had a lawful possessory interest in the Residence.  The Michigan Anti-Lockout Statute, MCL 600.2918, is applicable to tenants at will, by the years, or by sufferance.  *Barron v. Fed. Home Loan Mortg. Corp.*, No. 07-CV-11580, 2008 WL 275675, at *1 (E.D. Mich. Jan. 31, 2008).  Plaintiffs cannot reasonably assert that they had a tenancy by the years at the time of their ejection.  *See Cecil v. Viacom Outdoor Group, Inc.,* No. 05–71805, 2005 WL 2177096, at *4 (E.D. Mich. Sept. 8, 2005) (explaining that a tenancy by the years "is a tenancy which has a fixed, ascertainable term . . . which may not be unilaterally shortened by either party" and is "based upon an agreement between the parties ... that the relationship between

22

them is to be that of landlord and tenant"). Nor can they assert that they established a tenancy at will. *See id.* (explaining that tenancy at will "is a tenancy which has no definite term and which may be terminated at the discretion of either party" and is "based upon an agreement between the parties ... that the relationship between them is to be that of landlord and tenant").

However, there is a genuine dispute of material fact whether Plaintiffs have established a tenancy by sufferance. "In Michigan, a tenant by sufferance is one 'who came into possession [of the property] rightfully, by permission of the owner, and continued to occupy the premises after the expiration of his lease.'" *United States v. Hunyady*, 409 F.3d 297, 301 (6th Cir. 2005) (alteration in original) (quoting *Ryal's, Inc. v. Stavropoulos,* 273 Mich. 680, 263 N.W. 770, 770 (1935). However, "The common characteristic of all tenancies by sufferance is that the occupant at some prior point in time had the right to possess the premises" and that "prior right to possession must have [] arisen by agreement, not as a matter of law." *Cecil*, No. 2005 WL 2177096, at *4. Additionally, "in order to have the effect to create a tenancy by sufferance, the occupancy must be sufficiently long to warrant an inference of consent." *Sch. Dist. No. 11 of Alpine Twp. v. Batsche*, 106 Mich. 330, 333, 64 N.W. 196, 197 (1895). As such, the Sixth Circuit has found that a property owner allowing someone to reside on a property for about a month before providing

23

a notice to quit is insufficient to establish acquiescence and thus tenancy by sufferance. *Hunyady*, 409 F.3d at 302.

Plaintiffs do not dispute that Ms. Nava Lopez owned the Residence the entire time they lived there. Nevertheless, in July 2017, Ms. Dodson made the agreement to live in the Residence rent free with Mr. Watkins, who she has not been able to reach since the first time she spoke to Ms. Nava Lopez in January or February of 2019. During that first conversation, Ms. Nava Lopez informed Ms. Dodson she would have to start paying rent the following April. Ms. Dodson also testified that, through Mr. Emanuel, Ms. Nava Lopez sent her a residential lease agreement; however, this agreement was never executed. Then, in May of 2019, Ms. Nava Lopez sent Ms. Dodson the Notice to Quit. Notably, after reviewing the paperwork provided on the scene, the Defendant Officers "determined that the complainant was misled into believing that she was leasing the home by a third party." ECF No. 26-2, PageID.171. Thus, it is uncertain if Ms. Nava Lopez even knew the Dodson's were living in the Residence until early 2019. During the three to four months that Ms. Nava Lopez was indisputably aware of their possession, she asked Ms. Dodson to start paying rent and presumably refused to sign a residential lease agreement.

Because there is a material dispute of fact whether Ms. Nava Lopez "suffered" the Dodson's tenancy, the Court cannot grant summary judgment on Plaintiffs' Fourth Amendment claim. *See Dye v. Washtenaw Cnty. Sheriff Dep't*, No. 2:11-

24

CV-13967, 2011 WL 5975426, at *3 (E.D. Mich. Nov. 29, 2011) (finding the plaintiff had not "alleged a possessory interest in his campsite . . . sufficient to trigger the protections of the Fourth Amendment" because the location "is located on property owned by the state of Michigan" and the plaintiff had not alleged he "had acquired a legal right to possess the property through a lease, license or any other means"); *see also Ostensen v. Suffolk Cnty.*, 378 F. Supp. 2d 140, 148 (E.D.N.Y. 2005), *aff'd,* 236 F. App'x 651 (2d Cir. 2007) ("As such, no landlord-tenant or licensee relationship existed between the Plaintiff and the estate of the decedent. Without being able to establish that she had possessory interest in the house, the Plaintiff cannot successfully maintain an unreasonable seizure claim.").

## ii.   Fourteenth Amendment Claim

The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV. "[T]enants are generally 'entitled to pre-eviction judicial oversight in the absence of emergency circumstances.'" *Thomas*, 304 F.3d at 577 (*quoting Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994)).  However, procedural due process claims are examined in two distinct stages.  *Id.* at 576.  "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment.  Only after identifying such a right do we continue to consider whether the deprivation of that interest contravened notions of due

process." *Id.*  The Due Process Clause does not create property interests.  *Cleveland v. Bd. of Educ. of Loudermill*, 470 U.S. 532, 538 (1985).  "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

For the reasons stated in Section III.B.2.i. there is a genuine dispute of material fact whether Plaintiffs have established a possessory interest in the Residence sufficient under Michigan law to invoke procedural due process.  As such, the Court cannot grant summary judgment on Plaintiffs' Fourteenth Amendment claim. *See De Villar v. City of New York*, 628 F. Supp. 80, 83 (S.D.N.Y. 1986) ("Because the plaintiffs had no property interest in the apartments they were living in, their evictions did not implicate the Due Process Clause of the Fourteenth Amendment.").

### iii.    The *Monell* claim

Because the Court has determined there are genuine disputes of material facts as to whether Plaintiffs have suffered Fourth and Fourteenth Amendment violations, they are necessarily not entitled to summary judgment on their *Monell* claim.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the [Fourth Amendment violation]

26

is quite beside the point."); *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018) ("When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality." (quoting *Epps v. Lauderdale Cnty., Tennessee*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J. concurring)).

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that Defendant City of Detroit's Motion for Partial Summary Judgment (ECF No. 26) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs Motion for Partial Summary Judgment (ECF No. 27) is **DENIED**.

**IT IS FURTHER ORDERED** that the following dates shall govern in this matter:

Facilitation/Mediation: [6]                March 2023

---

[6] The parties shall submit the case to facilitation/mediation.  A proposed stipulated order referring case to facilitation/mediation shall be submitted to the Court via the utilities function on CM/ECF <u>no later than February 24, 2023.</u> The proposed order must identify the facilitator/mediator and the date set for facilitation/mediation. Facilitation/mediation must occur <u>no later than March 31, 2023.</u>

| | |
|---|---|
| Settlement Conference before Magistrate Judge Patti: | May 2023 |
| Motions *in Limine* cutoff: | June 1, 2023 |
| Joint Final Pretrial Order due: | June 1, 2023 |
| Final Pretrial Conference: | June 13, 2023 at 3:00 p.m. |
| Trial date: | July 11, 2023 at 9:00 a.m. |

The practices and procedures set forth in this Court's August 24, 2021 Scheduling Order shall remain in effect.  ECF No. 14, PageID.11622.

**IT IS SO ORDERED**.

/s/ Gershwin Drain_____
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  January 6, 2023

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 6, 2023, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager